UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAPITAL HEALTHCARE, LLC,

            Plaintiff,

v.

AMKAI, LLC,

            Defendant.

                                     /

Case No. 2:22-cv-12019

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING MOTION
TO COMPEL ARBITRATION AND DISMISS THE CASE [8]**

      Plaintiff Capital Healthcare LLC (Capital Healthcare) sued Defendant Amkai LLC (Amkai) in Oakland County Circuit Court in Michigan for a declaratory judgment and requested a judicial finding that the parties' alleged arbitration agreement was null and void. ECF 1-3. Akmai removed the case. ECF 1. Amkai then moved to compel arbitration and to dismiss. ECF 8. The parties briefed the motion. ECF 11; 12. For the following reasons, the Court will grant the motion.[1]

## BACKGROUND

      Dr. Ehab Gabr founded Capital Healthcare, a South Carolina limited liability company, in 2012. ECF 11, PgID 290. He is its sole member. *Id.* at 299. In 2015 Capital Healthcare hired Yousef Almadrahi to work as a "personal administrative assistant" for Dr. Gabr. *Id.* at 290. As time went on, Almadrahi was given "new

---

[1] Based on the parties' briefing, the Court will resolve the motion on the briefs without a hearing. *See* Fed. R. Civ. P. 78(b); E.D. Mich. L.R. 7.1(f)(2),

1

responsibilities, including some administrative matters regarding accounts payable, billing and payroll, as well as some staff oversight responsibility." *Id.* at 291. Dr. Gabr "occasionally direct[ed] Almadrahi to communicate with outside parties on his behalf." *Id.* And Almadrahi was "adept at his new responsibilit[ies]." *Id.* He was so adept that he "earned additional trust to work on administrative matters for tax and accounting with [Capital Healthcare]." *Id.* And from 2016 to February 2021, "Almadrahi was employed by [Capital Healthcare] as a Business Manager." ECF 8-2, PgID 228. And Almadrahi began "signing his emails as 'Business Manager'" in early 2018. ECF 11-4, PgID 330.

Around the same time that Almadrahi began to use the title "Business Manager," Dr. Gabr directed him to find medical practice management software for Capital Healthcare's use. ECF 11, PgID 291. Dr. Gabr referred Almadrahi to an outside consultant who would in turn "connect prospective software venders to Almadrahi." *Id.* at 291–92. The consultant eventually connected Amkai with Almadrahi. *Id.* at 292. Bruce Davis, an agent of Amkai, and Almadrahi "ultimately signed a subscription services agreement and two purchase orders in October 2018. *Id.* (alterations omitted). Amkai and Almadrahi then spent nearly eighteen months working to implement the software system that Almadrahi had purchased. *Id.* at 292–94. Their efforts to get the software system to operate involved other employees of Capital Healthcare. For example, Amkai and Almadrahi worked with Anita Martinez, an employee in Capital Healthcare's finance department. *See* ECF 8-1, PgID 189 (email from Martinez to Davis stating "I understood that we signed a

2

contract and that as of now the only balance that we have with [Amkai] is [$5,000.00] even. I do need something emailed from you consenting to that fact, and th[e]n I can release the payment that [Almadrahi] set up for processing of $5,000.00."). Amkai and Almadrahi also worked with Adam Kuz, a third-party contractor and the lead nurse anesthetist for Capital Healthcare. *See id.* at 198 (email from Kuz to Davis stating, "Let's touch base at the end of next week when the clinic reopens. It would be nice to get the ball rolling [on the software installation]."); ECF 11, PgID 302 ("Kuz a nurse anesthetist employed by a third-party staffing agency.").

After Almadrahi and Amkai failed to implement the software, Almadrahi left Capital Healthcare's employ. ECF 11, PgID 293. Capital Healthcare then refused to perform the parties' alleged contract and contended that Almadrahi lacked authority to sign a contract on its behalf. *See* ECF 1-3, PgID 39–40. When Amkai threatened a lawsuit, Capital Healthcare preemptively sued for the declaratory judgment described above. *See id.* at 41.

## LEGAL STANDARD

The Federal Arbitration Act (FAA) governs written arbitration agreements. 9 U.S.C. §§ 1–301. Under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The court must "hear the parties, and on being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue . . . direct[] the parties

3

to proceed to arbitration in accordance with the terms of the agreement." *Id.* "If the validity of the agreement to arbitrate is 'in issue,' the court must proceed to a trial to resolve the question." *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (quoting 9 U.S.C. § 4). But "[i]n order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Id.* (citation omitted). "The required showing mirrors that required to withstand summary judgment." *Id.* (citation omitted). And the Court must "apply ordinary [S]tate-law principles that govern the formation of contracts." *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 881 (6th Cir. 2021) (quotation and citation omitted). The Court must resolve "any ambiguities in the contract or doubts to the parties' intentions . . . in favor of arbitration." *Simons*, 288 F.3d at 889 (quotation omitted).

## DISCUSSION

To resolve a motion to compel arbitration, the Court must determine: (1) "whether the parties agreed to arbitrate"; (2) "the scope of [any] agreement"; (3) whether Congress intended any federal statutory claims asserted to be non-arbitrable; and (4) whether to stay the proceedings if some claims are not arbitrable. *Glazer v. Lehman Bros.*, 394 F.3d 444, 451 (6th Cir. 2005) (quotation omitted). The Court will consider each element in turn.

    A.    *Agreement to Arbitrate*

As a threshold matter, the Court must determine which State's law applies. It is long-settled that a federal court sitting in diversity must apply the choice-of-law

4

rules of the forum State. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941).

"Michigan's public policy favors the enforcement of contractual . . . choice-of-law provisions." *Turcheck v. Amerifund Fin., Inc.*, 272 Mich. App. 341, 345 (2006) (citation omitted). But Michigan courts will only "enforce contractual choice-of-law provisions if certain conditions are met." *Id.* at 346 (citations omitted). Namely, the Court must "determine the threshold issue whether a party is bound by a contract, and, accordingly, any . . . choice-of-law provision in the contract." *Id.* at 346 n.2 (citation omitted). To do so, "the court [must] determine under *its own law* whether the contractual choice-of-law provision is itself enforceable." *Id.* (emphasis added) (citation omitted).

The parties' alleged contract contains a choice-of-law provision that "[t]he validity, construction, and performance of the Agreement and the legal relations among the parties to the Agreement shall be governed by and construed in accordance with the laws of the State of Georgia."[2] ECF 11-6, PgID 342–43. The Court will therefore apply Michigan law to determine whether the contract is valid. If the contract is valid under Michigan law, the Court will apply Georgia law, under the above choice-of-law provision, to interpret it. *See* ECF 11-6, PgID 342–43.

Amkai argued that Capital Healthcare's "Business Manager," Almadrahi, signed the agreement on behalf of Capital Healthcare. ECF 8, PgID 89; *see* ECF 11-6, PgID 336. Capital Healthcare did not dispute that "Almadrahi signed the disputed

---

[2] Amkai is a citizen of both Delaware and Georgia. ECF 1, PgID 3.

[arbitration agreement]." ECF 11, PgID 297. But Capital Healthcare claimed that Almadrahi was "not authorized and did not have actual or apparent authority to sign the [a]greement." *Id.* The parties' only disagreement about the contract's validity, therefore, is whether Almadrahi could sign it. And whether a valid agreement to arbitrate exists turns on the question of whether Almadrahi was an agent with authority to bind Capital Healthcare to contracts under Michigan law.

"When a principal cloaks his agent with apparent authority to do an act not actually authorized, the principal is bound thereby." *Cutler v. Grinnell Bros.*, 325 Mich. 370, 376 (1949). To establish apparent agency, a party must show three elements: (1) "[t]he person dealing with the agent [did] so with belief in the agent's authority and this belief was reasonable"; (2) such belief was "generated by some act or neglect of the principal"; and (3) the "third person relying on the agent's apparent authority [was] not guilty of negligence." *Markel v. William Beaumont Hosp.*, 982 N.W.2d 151, 152 (Mich. 2022) (quotation omitted). "[A]pparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent." *Friendship Jackson, LLC v. Friendship Forest Park Ltd. Dividend Hous. Ass'n*, No. 345765, 2020 WL 862523, at *2 (Mich. Ct. App. Feb. 20, 2020) (quotation omitted). But an affirmative act by the principal is not required. Instead, an agency is apparent "when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." *Markel*, 982 N.W.2d at 153 (cleaned up). Last, a "principal is estopped from den[y]ing [an] agent's authority to perform [a particular act]" when the principal has put the

6

"agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform [o]n behalf of the principal the particular act and such particular act has been performed." *Atl. Die Casting Co. v. Whiting Tubular Prods., Inc.*, 337 Mich. 414, 422 (1953) (quotation omitted). The Court will address the three elements of apparent agency in turn.

### 1. Reasonable belief

Almadrahi introduced himself to Amkai as the business manager of Capital Healthcare. ECF 8, PgID 91; ECF 8-1, PgID 114. And Capital Healthcare acknowledged that Almadrahi was its business manager in other legal documents. ECF 8-2, PgID 222 ("It was brought to our attention on February 5, 2021 that the Business Manager Yousef Almadrahi appeared to embezzle from the taxpayer."); 228 ("Yousef Almadrahi was employed by the taxpayer as a Business Manager from 2016 to February 01, 2021"). The Michigan Supreme Court has held that "[o]bviously, a manager is in general charge[.] He makes contracts for sale or purchase of merchandise, and the conduct of the local business, which are binding on his principal. They are within the ambit of apparent authority." *Cutler*, 325 Mich. at 378. Here, Amkai dealt with Capital Healthcare's business manager and believed that he had authority to sign contracts on behalf of Capital Healthcare. Because business managers generally have authority to sign contracts, it was reasonable for Amkai to

7

believe in Almadrahi's authority. Thus, the first element of apparent authority is present.

        2.    *Act or neglect of principal*

Capital Healthcare "held out Almadrahi [] as his personal liaison: someone with whom [Amkai] could communicate while he was busy." ECF 11, PgID 301. In his capacity has personal liaison, "Almadrahi's expressly defined responsibilities at Capital Healthcare included some staff oversight." *Id.* at 303 (alterations and citation omitted). In Dr. Gabr's affidavit, he stated that he entrusted Almadrahi with "responsibility for administrative matters regarding billing and accounts payable, as well as some staff oversight." ECF 11-3, PgID 322. And in a letter to the IRS, Capital Healthcare stated that Almadrahi was its business manager. ECF 8-2, PgID 222, 228. Capital Healthcare also submitted an affidavit from Christy A. Federspeil, who was retained by Capital Healthcare "for tax, tax resolution services, and accounting services," and she also referred to Almadrahi as Capital Healthcare's business manager. ECF 11-4, PgID 328, 330 ("[T]hat is how I referred to him in my letter to the IRS."). Ms. Federspeil's affidavit was unrebutted. *See* ECF 12. And no evidence in the record suggests that Capital Healthcare ever openly acted to curb the apparent authority of Almadrahi. Further, no evidence shows that Capital Healthcare took any action to reflect that Almadrahi was unauthorized to sign contracts, an authority that is "obviously" held by a business manager. *Cutler*, 325 Mich. at 378. Indeed, the record reflects that "Almadrahi was in charge of other employees, who deferred to him in

8

the context of communications with [Amkai] and implementation of [Amkai's] software." ECF 8, PgID 91.

What is more, Capital Healthcare placed Almadrahi in a position of authority and allowed Amkai to believe Almadrahi could sign contracts. Capital Healthcare did not exercise "ordinary care" to ensure that Almadrahi, who was held out as its actual agent in some matters, was not also held out to be an agent authorized to sign contracts. *Markel*, 982 N.W.2d at 153; *see Atlantic Die Casting Co.*, 337 Mich. at 422. Indeed, Capital Healthcare knowingly—or, at minimum, negligently—allowed Almadrahi to call himself a "Business Manager" for *five years* without ever informing third parties that Almadrahi did not have the ordinary authority entrusted to a business manager. ECF 8-2, PgID 228. Thus, Capital Healthcare caused Amkai to believe in the apparent authority of Almadrahi because it was at least negligent when it held out Almadrahi as its agent and business manager in some respects.[3] The second element of apparent authority is therefore present.

---

[3] Capital Healthcare argued that "[t]hose interacting with agents must inquire into the agent's authority." ECF 11, PgID 301. But the cases Capital Healthcare cited to support its argument are distinguishable. *See id.* (citing *Liberty Heating & Cooling, Inc. v. Builders Square, Inc.*, 788 F. Supp. 1438, 1445–46 (E.D. Mich. 1992) and *Cutler*, 325 Mich. at 376). The cases relied on the reasoning in *Hurley v. Watson*, 68 Mich. 531 (1888). In *Hurley*, the Michigan Supreme Court held that a third-party contracting with an agent must "exercise the diligence usual with good business men [sic] under the circumstances," and that such diligence may include a duty to inquire into the agent's authority when circumstances so require. *Id.* at 536 (alterations omitted). "If there is anything likely to put a reasonable business man [sic] upon his guard as to the authority of the agent, it is the duty of the third party to inquire how far the agent's acts are in pursuance of the principal's limitation." *Id.* But as explained above, similar circumstances do not exist here. Here, Capital Healthcare negligently held out Almadrahi as its business manager, and it is well established

9

      *3.     Reliance*

Amkai was not negligent when it relied on Almadrahi's apparent authority. As explained above, Almadrahi held himself out as a business manager for several years. And Capital Healthcare never acted to revoke the title. In Michigan, "a manager is in general charge. He makes contracts for sale or purchase . . . which are binding on his principal." *Cutler*, 325 Mich. at 378. Consequently, Amkai was not negligent when it relied on the authority of Almadrahi to sign contracts for the purchase of a service or good.

In all, Amkai reasonably believed that Almadrahi was an agent authorized to sign contracts; Capital Healthcare negligently caused the mistaken belief; and Amkai was not negligent in believing that Almadrahi had authority to bind Capital Healthcare to contracts. Almadrahi therefore had apparent authority to sign the arbitration clause at issue on behalf of Capital Healthcare.

Having found that the parties agreed to arbitrate, the Court will proceed with the remaining three *Glazer* factors. *See* 394 F.3d at 451.

    B.    *Scope of Arbitration Agreement*

The arbitration agreement in the parties' contract stated that "[a]ll disputes of every kind and nature between [Capital Healthcare] and [Amkai] . . . shall be submitted to binding arbitration pursuant to the then existing Commercial

---

that a business manager "makes contracts for sale or purchase of merchandise . . . which are binding on his principal." *Cutler*, 325 Mich. at 378. Thus, reasonable diligence did not require Amkai to inquire into the scope of Almadrahi's authority.

Arbitration Rules of the American Arbitration Association." ECF 8-1, PgID 128. Amkai argued that "the payment dispute between the parties is within the scope of the arbitration clause." ECF 8, PgID 107 (alterations omitted). Capital Healthcare did not disagree. *See* ECF 11. Thus, because the dispute is within the plain language of the contract and Capital Healthcare does not dispute that conclusion, the Court will find that the present litigation is within the scope of the arbitration agreement. *Waffle House, Inc. v. Pavesi*, 343 Ga. App. 102, 107 (2017) ("General principles of contract law govern the formation, interpretation, and enforceability of arbitration agreements."); *Freund v. Warren*, 320 Ga. App. 765, 768–69 (2013) ("no construction is required or even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation.").

    C.    *Congressional Intent*

Neither party argued that Congress intended claims for declaratory judgments to be non-arbitrable. *See* ECF 8; 11; 12. Nor did the Court's research reveal any case in which a court found claims like the ones Capital Healthcare brought to be non-arbitrable. Thus, the Court finds that Congress did not intend these claims to be non-arbitrable.

    D.    *Stay of the Proceedings*

Last, the entirety of the complaint is subject to arbitration because the only issues in the case are whether and how the contract should be enforced. And Capital Healthcare did not argue that any of its claims should be exempt from arbitration. *See* ECF 11. It is therefore proper for the Court to dismiss the case because, simply put,

11

the Court need not stay the proceedings. *See Hensel v. Cargill*, 198 F.3d 245 (Table), 1999 WL 993775, at *4 (6th Cir. 1999) ("Under § 3 of the FAA, if any separate claim is referable to arbitration, then a stay of proceedings on the remaining claims is mandatory. However, litigation in which all claims are referred to arbitration may be dismissed."); *Shammami v. Broad St. Sec., Inc.*, 544 F. Supp. 2d 585, 588 (E.D. Mich. 2008) ("[B]ecause Defendants are requesting dismissal and Capital Healthcare does not dispute that all of the claims asserted in his amended complaint must be submitted to arbitration, the Court finds that dismissal of this action is the proper course of action.").

In sum, the Court will grant the motion to compel arbitration and dismiss the case because the parties signed a valid arbitration agreement, the arbitration agreement encompasses the claims raised here, Congress did not intend any of the claims to be non-arbitrable, and the case need not be stayed.

**WHEREFORE**, it is hereby **ORDERED** that the motion to compel arbitration [8] is **GRANTED** and the case is **DISMISSED**.

**IT IS FURTHER ORDERED** that the parties must **PROCEED** to arbitration under the terms of the arbitration agreement.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III  
STEPHEN J. MURPHY, III  
United States District Judge

Dated: April 25, 2023

12

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 25, 2023, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager
